IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
CORTNEY HOBBS,                       *
                                     *
     Plaintiff,                      *
                                     *
     v.                              *    CV 115-010
                                     *
GEORGE LEE II; TIFFANY               *
SMITHWICK; and BRANDON THACKER,      *
                                     *
     Defendants.                     *
```

## O R D E R

Before the Court is the remaining defendants George Lee II, Tiffany Smithwick, and Brandon Thacker's ("Defendants") Motion for Summary Judgment. (Doc. 42.) The Clerk of Court gave Plaintiff timely notice of Defendants' summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 47.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied. Plaintiff filed a response and a sur-reply in opposition to the summary judgment motion and Defendants filed a reply in support. (Doc. 64, 70, 72.) The time for filing materials in opposition has expired, and the motion is ripe for consideration. Upon consideration of the record evidence, relevant law, and the parties' respective briefs, Defendants' motion is **DENIED**.

# I. BACKGROUND

Between midnight and 12:30 a.m. on January 19, 2013, Plaintiff left his apartment in his 1979 Chevrolet El Camino with the intent to visit a friend. (Pl.'s Resp. to Defs.' Statement of Material Facts ("PSMF"), Doc. 65, ¶¶ 4-5; see also Hobbs Dep., Doc. 50, at 43-46.) Plaintiff was subsequently stopped by a Columbia County Sheriff's Deputy, Defendant Lee,[1] for having allegedly failed to maintain his lane.[2] (Lee Dep., Doc. 51, at 20-21.) Plaintiff denies that he failed to maintain his lane or otherwise did anything justifying the traffic stop. (Hobbs Dep. at 114.)

After Plaintiff stopped,[3] Defendant Lee exited his patrol car and approached Plaintiff's vehicle. (PSMF ¶ 16; Lee Dep. at 26-27.) Plaintiff identified himself and informed Defendant Lee that he was having difficulty locating his driver's license. (Hobbs Dep. at 69-70; Lee Dep. at 28.) According to Defendant Lee, Plaintiff "was acting very nervous," "was moving around

---

[1] Defendant Lee was parked perpendicular to the road Plaintiff was travelling on at the time he began following Plaintiff and tailed him for approximately one mile before Plaintiff allegedly committed a traffic violation. (Lee Dep. at 6-7, 20-21, 63-64.) Defendant Lee states that Plaintiff "passed through [his] headlights" as he passed by Defendant Lee's vehicle, which was parked less than thirty feet from the road on which Plaintiff was travelling. (Id. at 63-64.) Defendant Lee further states that he does not know why he initially began following Plaintiff. (Id.)

[2] While Defendant Lee called into dispatch to report the traffic stop, he did not inform dispatch the reason for the traffic stop. (Lee Dep. at 24.) Likewise, he never informed Plaintiff why he had been stopped, despite it being Columbia County's policy to do so. (Lee Dep. at 30-31, 66, 69.)

[3] Plaintiff originally pulled over to the side of the road when he noticed flashing blue lights in his rearview mirror. He was subsequently instructed by Defendant Lee via loudspeaker to pull into the nearby parking lot of a closed-down business. (See Hobbs Dep. at 53-55.)

constantly," "kept touching the lower left side of his jacket," and his "speech was labored" and "eyes were bloodshot."[4] (Lee Decl., Doc. 42-10, ¶ 7; see also Lee Dep. at 31.) Defendant Lee returned to his patrol vehicle to verify Plaintiff's identity and the vehicle's status, as well as any warrants against Plaintiff that were outstanding, and "[e]verything came back valid." (Lee Dep. at 28-30; PSMF ¶ 22.)

Defendant Lee then returned to Plaintiff's vehicle and requested Plaintiff's permission to search his vehicle.[5] (Hobbs Dep. at 74; Lee Dep. at 30.) Plaintiff initially refused Defendant Lee's request, who then told Plaintiff to "wait a minute or hold on" without further explanation.[6] (Lee Dep. at 30, 49-50; see also Hobbs Dep. at 74.) After "waiting for a while," Plaintiff became restless and consented to the search of

---

[4] While Plaintiff admits he is often nervous around law enforcement officers, he denies any insinuation that he was checking his pockets in a repeated, apprehensive, or otherwise suspicious manner. (See Hobbs Dep. at 60-70 (Q: "Okay. At some point did you reach to check whether you had the marijuana there [in your left pocket]?" A: "No, I knew I had it already." Q: "Okay. So you're saying you didn't reach to check?" A: "I reached for my license, not marijuana." . . . Q: "Okay. And after the officer came to your door or came up to the – your vehicle, you spent some time looking for the license at that point; is that right?" A: "Not when he came to the vehicle. I probably was looking for my license, yeah, probably for like a quick second or something like that maybe and just ended up telling him I couldn't find it or . . .").) Plaintiff also denies any insinuation that he was operating his vehicle while impaired. (See id. at 70.)

[5] (See Lee Decl. ¶ 10 ("I returned to [Plaintiff's] vehicle within about five minutes after I left to make the basic checks on the laptop in my patrol car. When I returned, I requested that I be allowed to search the vehicle. The reason I made the request is that [Plaintiff's] behavior, in my experience, was consistent with a person who may be involved with narcotics, and I believed there was a possibility that there were drugs in the car."); Lee Dep. at 30-31 (similar).)

[6] (Lee Dep. at 49-50 (Q: "What did you mean when you told [Plaintiff] to 'hold on for a minute'?" A: "I was going to call a canine to come to the location." Q: "All right. Did you tell him that was why you were telling him to hold on for a minute?" A: "No, sir.").)

3

his vehicle.[7] (Hobbs Dep. at 74; see also Lee Dep. at 30, 49-50; PSMF ¶ 24.) At this time two additional officers with the Columbia County Sheriff's Office, Defendants Thacker and Smithwick, arrived on the scene.[8] (Lee Dep. at 32; Smithwick Dep., Doc. 57, at 7-9, 15; Thacker Dep., Doc. 52, at 20-23; PSMF ¶ 25.) Defendant Lee then asked Plaintiff to exit and step to the rear of Plaintiff's vehicle, where Defendants Thacker and Smithwick were standing. (Hobbs Dep. at 75; Lee Dep. at 39; PSMF ¶ 26.)

As requested, Plaintiff exited his vehicle and walked towards Defendants Thacker and Smithwick. (Hobbs Dep. at 74-79; Lee Dep. at 39; Smithwick Dep. at 9; Thacker Dep. at 23-24.) When he reached Defendants Thacker and Smithwick, Plaintiff turned around; without warning, Defendant Smithwick began frisking Plaintiff from behind.[9] (Hobbs Dep. at 76, 80; but see

---

[7] (Hobbs Dep. at 74 (Q: "Okay. And when he came back to your vehicle, did he ask you for consent to search your vehicle?" A: "Yes, sir." Q: "Okay. And what did you say in response?" A: "At first I told him no." Q: "Okay. And then what did you tell him." A: "After a while we were waiting for a while, I got restless, and I just told him: If you search my car, can - will I be able to leave? And he said: Yes, as long as you don't have anything in it. And I just got out of my car and walked to the back of my car while he searched it.").)

[8] Defendant Smithwick was in training with the Columbia County Sheriff's Office on the night of the incident; Defendant Thacker was her training officer. (Smithwick Dep. at 7.)

[9] Defendants Smithwick and Thacker assert that Plaintiff placed his hands in his pocket after exiting his vehicle and that, despite Defendant Thacker instructing Plaintiff to remove his hands from his pockets, Plaintiff refused to do so voluntarily. (Thacker Dep. at 23-24; Thacker Decl., Doc. 42-11, ¶ 6 & Ex. 1; Smithwick Dep. at 9, 27-28.) Plaintiff, in turn, states that he does not remember having his hands in his pockets and denies that he failed to heed Defendant Thacker's instruction (if it was even given), stating that he "put [his] hands in the air" as soon as Defendant Smithwick began frisking him. (Hobbs Dep. at 77-82.) Further, Defendant Smithwick asserts that she began frisking Plaintiff at his "neck-shoulder area" (Smithwich Dep. at 9),

4

Smithwick Dep. at 9; Thacker Dep. at 24-25.) Caught off guard by Defendant Smithwick's frisking,[10] Plaintiff put his hands in the air, began backing up, and stated that he did not consent to any search of his person. (Hobbs Dep. at 80-82; but see Smithwick Dep. at 9; Thacker Dep. at 24-28.) Defendant Smithwick continued the frisk undeterred. (Hobbs Dep. at 81-82; Smithwick Dep. at 14-16; Thacker Dep. at 24-29.)

During her frisk of Plaintiff, Defendant Smithwick felt an item in Plaintiff's bottom-left jacket pocket and asked Plaintiff to identify it. (Hobbs Dep. at 82; but see Lee Dep. at 54; Lee Decl. ¶ 16; Smithwick Dep. at 15-16; Thacker Dep. at 24-25.) Plaintiff informed her that it was a glass mason jar containing marijuana. (Hobbs Dep. at 82; Thacker Dep. at 25, 29.) Without further instruction, Defendants Thacker and Strickland immediately grabbed Plaintiff's arms and attempted to force him to the ground. (Hobbs Dep. at 82; but see Lee Dep. at 39-42; Smithwick Dep. at 16-17; Thacker Dep. at 25-26.) Plaintiff was forced to his knees and – to avoid having his face hit the ground – used his left hand to prop himself up. (Hobbs Dep. at 82-89; Lee Dep. at 41-42.) At this point, Defendant Smithwick had Plaintiff in a headlock, Defendant Thacker was

---

while Plaintiff states that she began the frisk at his ankles (Hobbs Dep. at 80-81).

[10] Defendant Smithwick asserts that, before frisking Plaintiff, she "advis[ed] him that [she] was going to pat him down." (Smithwick Dep. at 9.) Plaintiff denies that any such notice was given. (Hobbs Dep. at 79.) Notably, Defendant Lee stated that he neither provided notice to Plaintiff about the need to frisk him and that he "had no suspicion . . . to do a pat down." (See Lee Dep. at 33-34.)

5

holding Plaintiff's right arm behind his back, and Defendant Lee was on Plaintiff's left side.[11] (Hobbs Dep. at 86-87; but see Lee Dep. at 41-42, 47, 53; Smithwick Dep. at 17-19; Thacker Dep. at 25-27.) Defendant Lee then struck Plaintiff in the face on or near his left eye.[12] (Hobbs Dep. at 90-92; Lee Dep. at 42.) After Defendant Lee struck Plaintiff in the face, Defendants placed Plaintiff in handcuffs.[13] (Hobbs Dep. at 93-95; Lee Decl. ¶ 14; Smithwick Dep. at 20-21; Thacker Dep. at 27-28.)

After the incident, a narcotics investigator with the Columbia County Sheriff's Office, John Seebode, arrived on the scene. (Hobbs Dep. at 97-98; Seebode Decl., Doc. 42-9, ¶ 4.) Mr. Seebode read Plaintiff his Miranda rights and obtained a Miranda waiver from Plaintiff before interviewing him. (Hobbs Dep. at 97-100, 115-23; Seebode Decl. ¶ 9.) An EMT eventually

---

[11] Defendants insist that they instructed Plaintiff numerous times to "show me your hands" or "give me your hands." (Lee Dep. at 40; Thacker Dep. at 25, 36.) Plaintiff denies that he was ever given any such instruction. (Hobbs Dep. at 87-88, 93-94.) Plaintiff does admit, however, that at one point an officer was yelling in his ear for him to "stop fu[**]ing resisting." (Hobbs Dep. at 92-94.)

[12] Defendant Lee asserts that he used "hard hands" – that is, punching with a closed fist – when he struck Plaintiff in the face. (Lee Dep. at 42, 53.) Plaintiff, however, believes Defendant Lee struck him with a flashlight or other hard object. (See Hobbs Dep. at 90-92 (Q: "Now, did one of the deputies use hard hand techniques on you, in other words, use his first [sic]?" A: "I didn't think it was his fist, but that's what he said." Q: "What did you think it was?" A: "I felt like it was an object. I felt like he hit me with a flashlight or something like that. I'm not sure." . . . . Q: "You just felt like what was used was hard?" A: "Yeah. I know – yeah, it was hard, and, like, it went directly into my eye, whatever it was, I felt that." Q: ". . . Just so we're clear, you were assuming it may have been a flashlight, but you never actually saw the officers with a flashlight?" A: "Yes, sir.").)

[13] According to Defendant Lee, they continued their search of Plaintiff after placing him in handcuffs and only then found the jar containing marijuana in his left jacket pocket. (Lee Dep. at 54; Lee Decl. ¶ 16.) Plaintiff denies this allegation, claiming that the jar and marijuana were located and identified immediately before Defendants forced him to the ground. (Hobbs Dep. at 82; Thacker Dep. at 28-29.)

6

arrived on the scene and asked Plaintiff if he wanted to go to the hospital for treatment of his injuries. (Hobbs Dep. at 95-96.) While Plaintiff initially stated that he wished to go to the hospital, he declined EMT's offer after one of the Defendants dissuaded him from seeking medical treatment.[14] (Hobbs Dep. at 96-97.) Plaintiff was subsequently taken to the Columbia County Detention Center ("CCDC") for booking. (Hobbs Dep. at 103-04; see also Doc. 64-1 (Plaintiff's booking photo).) At approximately 8:17 a.m. on January 19, 2013, Plaintiff was "bonded out and released from [the CCDC]." (Hobbs Dep. at 105.) Immediately after his release from the CCDC, Plaintiff went to the emergency room for his injuries.[15] (Id. at 107-09.)

Plaintiff was subsequently charged with obstruction of a law enforcement officer and possession of marijuana, and was issued a "courtesy warning" for failure to maintain lane. (Hobbs Dep. at 110-12 & Exs. 6, 7, 8.) On or about June 24,

---

[14] (See Hobbs Dep. at 96-97 (Q: "And did the EMT ask you if you wanted to go to the hospital?" A: "Well, yes, they asked me that, and then the officer, one of the officers that was there he asked – I told him, yes, I wanted to go to the hospital, then he said: Well, if you go to the hospital, you're still going to jail, so you might as well go to jail and get it over with. I'm thinking about I need to go to work tomorrow. I didn't know how bad my eye was, I didn't get to see a picture of my eye or anything like that. And at the time, like, I didn't feel, like, any – I didn't feel like anything hurt at the time, and I just – I was teared up, but I didn't know it was blood. I thought it was, like, water or something like that. So I was just thinking I need to be able to go to the [sic] work the next day, so just take me to jail so I can bond out and go to work tomorrow." Q: "So at some point in that evening did you tell EMS that you did not want to go to the hospital then?" A: "Yeah, after he said that.").)

[15] The injuries sustained by Plaintiff in the altercation require surgery to correct. (Hobbs Dep. at 141-43; Doc. 64-2 (Plaintiff's relevant medical records).)

7

2013, the aforementioned criminal charges brought against Plaintiff were dismissed *nolle prosequi*.

On January 20, 2015, Plaintiff filed his present complaint alleging constitutional violations under 42 U.S.C. § 1983. On November 15, 2016, Plaintiff and all of the defendants filed a stipulation of dismissal with prejudice as to defendants Clay Whittle, John Whittle, Lou Ciamillo, John Seebode, and Columbia County, which the Court granted on November 30, 2016.[16] (Docs. 63, 69.) The remaining Defendants now move for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259, 1260 (11th Cir. 2004); FED. R. CIV. P. 56(c). The "purpose of summary judgment is

---

[16] In its Order dismissing Clay Whittle, John Whittle, Lou Ciamillo, John Seebode, and Columbia County, the Court explicitly stated that "[t]his Order shall have no effect upon the claims made by Plaintiff against the remaining Defendants: George Lee, Tiffanie Smithwick, and Brandon Thacker." (Doc. 69, at 2.)

8

to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating that there is indeed a genuine issue as to the material facts of its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Matsushita, 475 U.S. at 587. The Court must also avoid weighing conflicting evidence. Anderson, 477 U.S. at

9

255; McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); Pepper v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989). "The non-moving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Bryant v. Dougherty Cty. Sch. Sys., 382 F. App'x 914, 917 (11th Cir. 2010) (citing Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986))).

### III. DISCUSSION

In his complaint, Plaintiff raises four primary claims pursuant to 42 U.S.C. § 1983 in connection with the January 19, 2013 incident, namely: (1) stop without probable cause in violation of the Fourth Amendment; (2) unreasonable search and seizure in violation of the Fourth Amendment; (3) use of excessive force during the stop in violation of the Fourth and Fourteenth Amendment; and (4) unlawful arrest and deprivation of liberty without probable cause in violation of the Fourteenth

Amendment.[17] Defendants, in turn, claim they are entitled to qualified immunity and therefore immune to suit.

"Qualified immunity protects government officials sued in their individual capacities as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Lumley v. City of Dade City, 327 F.3d 1186, 1193-94 (11th Cir. 2003) (internal quotations and citations omitted). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. at 1194 (citations omitted). Here, it is clear that Defendants were acting in their discretionary capacities when they stopped, frisked, engaged, and arrested Plaintiff, a point which Plaintiff does not contest. Accordingly, the burden shifts to Plaintiff to demonstrate that qualified immunity is not appropriate. Id.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014). "The first [prong] asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001) (alterations omitted)). "The second prong of the

---

[17] Plaintiff also seeks punitive damages and expenses of litigation. (See Doc. 1, at 25.)

qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."[18] Id. at 1866 (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "Courts have discretion to decide the order in which to engage these two prongs . . . . [b]ut under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."[19] Id. (citations omitted)

"A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." Heien v. North Carolina, 135 S. Ct. 530, 536 (2014) (citing Brendlin v. California, 551 U.S. 249, 255-259 (2007)); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) ("Because a routine traffic stop is only a limited form of

---

[18] Tolan, 134 S. Ct. at 1866 ("Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." (internal quotations, citations, and alterations omitted)).

[19] Tolan, 134 S. Ct. at 1866 ("This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . In making that determination, a court must view the evidence in the light most favorable to the opposing party." (internal quotations and citations omitted)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." (citations omitted)).

seizure, it is more analogous to an investigative detention than a custodial arrest." (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984)). "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks omitted) (citing United States v. Cortez, 449 U.S. 411, 417-418 (1981), and Terry v. Ohio, 392 U.S. 1, 21-22 (1968)); United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003) ("[A] traffic stop is a constitutional detention if it is justified by reasonable suspicion under Terry or probable cause to believe a traffic violation has occurred under Whren."). "The 'reasonable suspicion' necessary to justify such a stop . . . takes into account the totality of the circumstances" and requires "considerably less" suspicion than "proof of wrongdoing by a preponderance of the evidence" and "'obviously less' than is necessary for probable cause." Navarette, 134 S. Ct. at 1687 (citations omitted); see also id. at 1690 ("Reasonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (internal quotation marks omitted) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)); see also Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) ("While 'reasonable

13

suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." (citations omitted)).

A law enforcement "officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place" and "[t]he traffic stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." Purcell, 236 F.3d at 1277 (internal quotations and citations omitted)); see also United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) ("[I]n evaluating the constitutionality of an investigatory stop, the court must examine whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Under Terry, law enforcement officers may detain a person briefly for an investigatory stop *if they have a reasonable, articulable suspicion based on objective facts* that the person has engaged in, or is about to engage in, criminal activity." (internal quotation marks omitted) (citing Terry v. Ohio, 392 U.S. 1, 20, 27 (1968)). Where officers have reasonable suspicion to make a traffic stop, they also have the

14

right to make a limited protective search for concealed weapons. United States v. Cruz, 909 F.2d 422, 424 (11th Cir. 1989); see also Riley v. City of Montgomery, 104 F.3d 1247, 1250-51 (11th Cir. 1997) ("A warrantless weapons search of a suspect and his car, pursuant to a limited detention, does not violate the Fourth Amendment if the police have reasonable articulable suspicion to justify such a limited detention." (citations omitted)). Where law enforcement officers have reasonable suspicion to make a traffic stop (or probable cause to effectuate an arrest), they have "the right to use some degree of physical coercion or threat thereof to effect it" so long as "the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." Graham v. Connor, 490 U.S. 386, 396 (1989) (internal quotations and citations omitted)); see also Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest. . . . [I]n order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

15

or attempting to evade arrest by flight.'" (quoting Graham, 490 U.S. at 394-96)); Campbell v. Lynch, 264 F. App'x 836, 838 (11th Cir. 2008) ("[T]he use of significant force is excessive when there is no need for force and an officer has a duty to intervene to stop another officer's use of excessive force."). Finally, where law enforcement officers have reasonably trustworthy information to believe that the suspect has committed or is committing a criminal offense (*i.e.*, probable cause), they may arrest the suspect without a warrant. See Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996) ("A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim. An arrest made with probable cause, however, constitutes an absolute bar to a section 1983 action for false arrest." (citing Marx v. Gumbinner, 905 F.2d 1503, 1505 (11th Cir. 1990)); see also Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004) ("Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment. Likewise, falsifying facts to establish probable cause is patently unconstitutional and has been so long before [the plaintiff's] arrest in 1995." (internal quotations and citations omitted)).

Here - as demonstrated in the Court's recitation of the relevant facts[20] - there exist numerous material disputes of fact from which a reasonable factfinder could conclude that Defendants violated Plaintiff's constitutional rights. Indeed, viewed in the light most favorable to Plaintiff, the facts support a reasonable conclusion that Defendants' complained-of conduct was unconstitutional. Moreover, as explained above, the law was sufficiently developed to provide fair warning to Defendants that their alleged conduct was unconstitutional.

For example, Defendant Lee asserts that his basis for stopping Plaintiff's vehicle was his first-hand observation of Plaintiff "fail[ing] to maintain lane . . . by weaving into the outside lane and coming back to the inside lane." (Lee Dep. at 20.) Yet Plaintiff denies that he did - or failed to do - anything justifying the stop. (Hobbs Dep. at 114.) While it is true that Plaintiff cannot avoid summary judgment by second-guessing the conclusions that Defendant Lee may have reasonably drawn from his observations,[21] Plaintiff is not solely attacking Defendant Lee's suspicions of criminal activity; rather, Plaintiff disputes the predicate facts on which Defendant Lee's suspicions are explicitly based. Indeed, Plaintiff is in effect alleging that Defendant Lee has fabricated facts in an attempt

---

[20] See Section I, *supra*.
[21] See, e.g., Navarette, 134 S. Ct. at 1691 ("[R]easonable suspicion need not rule out the possibility of innocent conduct." (internal quotations and citations omitted)).

to manufacture an objective justification for the traffic stop, which would be a clear violation of the Fourth Amendment. See Kingsland, 382 F.3d at 1232. The facts in the record, interpreted in the light most favorable to Plaintiff, sufficiently support this allegation of a violation of his clearly established Fourth Amendment right to be free of unreasonable searches and seizures. Accordingly, neither summary judgment nor qualified immunity is proper on this claim at this juncture.

Defendants' arguments that they are entitled to qualified immunity as to Plaintiff's other claims[22] similarly hinge upon the conclusion that Defendant Lee had reasonable suspicion to initially stop Plaintiff's vehicle and/or the resolution of other genuine disputes of material facts in their favor. Given that the law was similarly sufficiently developed to put Defendants on notice of the unconstitutionality of their alleged conduct with regards to these other claims,[23] Defendants are therefore not entitled to summary judgment on such claims. To conclude otherwise would require the Court to weigh the evidence and resolve genuine disputes of material facts in favor of the moving party, which is wholly inappropriate at summary judgment. See, e.g., Anderson, 477 U.S. at 255; Kingsland, 382 F.3d at

---

[22] *i.e.*, unlawful detention/frisk, excessive use of force, and unlawful arrest.
[23] See, e.g., Campbell, 264 F. App'x at 838; Lee, 284 F.3d at 1197; Purcell, 236 F.3d at 1277; Powell, 222 F.3d at 917; Riley, 104 F.3d at 1250-51; Cruz, 909 F.2d at 424.

1227 (11th Cir. 2004) ("[P]laintiff has proffered no less evidence regarding the presence or absence of a cannabis odor than the defendants have. The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment stage, we must accept [the plaintiff's] version of the facts as true. . . . Whether an odor of cannabis was indeed emanating from the truck is a genuine issue of material fact suitable for consideration by a jury." (citations omitted)); Herren v. Bowyer, 850 F.2d 1543, 1546 (11th Cir. 1988) ("[I]f the legal norms allegedly violated were as a matter of law clearly established at the appropriate time, a genuine fact issue as to what conduct the defendant engaged in would preclude a grant of summary judgment based upon qualified immunity." (citations omitted)). Accordingly, Plaintiffs' claims will proceed to trial.

## IV. CONCLUSION

Based upon the foregoing and due consideration, the Court concludes that the remaining Defendants are not entitled to summary judgment on Plaintiff's claims. Accordingly, the remaining Defendants' motion for summary judgment (doc. 41) is **DENIED**.[24]

---

[24] Prior to its dismissal from this case, Columbia County filed its own motion for summary judgment. (Doc. 44.) Because Columbia County has been dismissed from this case with prejudice, its motion for summary judgment (doc. 44) is **DENIED AS MOOT**. Similarly, prior to their dismissal from this case, Clay

19

**ORDER ENTERED** at Augusta, Georgia, this 22nd day of September, 2017.

/s/ J. Randal Hall
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

Whittle, John Whittle, Lou Ciamillo, and John Seebode joined in the remaining Defendants' present motion for summary judgment (see Doc. 41); because they have been dismissed from this case with prejudice, the present motion for summary judgment (doc. 41) is **DENIED AS MOOT** with regards to Clay Whittle, John Whittle, Lou Ciamillo, and John Seebode.

20